# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| ADAM S. LEVY on behalf of himself and all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> THOMAS GUTIERREZ, RICHARD J. GAYNOR, RAJA BAL, J. MICHAL CONAWAY, KATHLEEN A. COTE, ERNEST L. GODSHALK, MATTHEW E. MASSENGILL, MARY PETROVICH, ROBERT E. SWITZ, NOEL G. WATSON, THOMAS WROE, JR., MORGAN STANLEY & CO. LLC, GOLDMAN SACHS & CO., AND CANACCORD GENUITY INC., <br><br> Defendants. | No. 1:14-cv-00443-JL <br><br> Honorable Joseph Laplante <br><br> JURY TRIAL DEMANDED <br><br> **ORAL ARGUMENT REQUESTED** |

## UNDERWRITER DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT

**BOUTIN & ALTIERI, P.L.L.C.**

Edmund J. Boutin, Esq. (N.H. Bar #59)
Brenda Keith, Esq. (N.H. Bar #12883)
One Buttrick Road
P.O. Box 1107
Londonderry, NH 03053
Phone: (603) 432-9566
Email: eboutin@boutinlaw.com
Email: bkeith@boutinlaw.com

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

Richard A. Rosen, Esq. (*pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019-6064
Phone: (212) 373-3000
Email: rrosen@paulweiss.com

*Attorneys for Defendants Morgan Stanley & Co. LLC, Goldman Sachs & Co., and Canaccord Genuity Inc.*

## Table of Contents

Table of Contents ............................................................................................................. i

Table of Authorities ........................................................................................................ ii

Preliminary Statement .....................................................................................................1

I.   THE OFFERING MATERIALS DISCLOSED THE KEY CONTRACT TERMS AND ALL OF THE ATTENDANT RISKS ...............................................................2

    A.   GTAT Fully Disclosed Apple's Rights and GTAT's Obligations Under the Apple Agreement................................................................................................2

    B.   GTAT Accurately Disclosed Apple's Exclusivity Rights ......................................3

    C.   GTAT Fully Disclosed the Risks Associated with Producing Sapphire .................5

    D.   GTAT's Disclosures Were Sufficient to Inform Investors of the Limited Time GTAT Had to Produce Sapphire .........................................................................8

    E.   GTAT Fully Disclosed the Risk that the Apple Agreement Might Not Generate Significant Revenue ...........................................................................................9

    F.   GTAT Accurately and Fully Disclosed the Status of Its Liquidity and Cash Reserves ..........................................................................................................11

II.  GTAT'S FORWARD LOOKING STATEMENTS ARE PROTECTED BY THE SAFE HARBOR ....................................................................................................12

III. THE NAMED PLAINTIFFS DO NOT HAVE STANDING TO PURSUE SECURITIES ACT CLAIMS BECAUSE THEY WERE *SELLERS* OF GTAT COMMON STOCK ................................................................................................13

## Table of Authorities

Page(s)

**Cases**

*In re Am Int'l Grp., Inc., 2008 Sec. Litig.*,
  No. 08-civ-4772, 2013 WL 1787567 (S.D.N.Y. Apr. 26, 2013) ................................. 13

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
  381 F. Supp. 2d 192 (S.D.N.Y. 2004) ....................................................................... 14

*In re Ariad Pharm., Inc.*,
  98 F. Supp. 3d 147 (D. Mass. 2015) .......................................................................... 12

*Backman* v. *Polaroid Corp.*,
  910 F.2d 10 (1st Cir. 1990) ................................................................................ 5, 7, 8

*Barry* v. *St. Paul Fire & Marine Ins. Co.*,
  555 F.2d 3 (1st Cir. 1977) .......................................................................................... 14

*In re Convergent Techs. Sec. Litig.*,
  948 F.2d 507 (9th Cir. 1991) ........................................................................................ 7

*In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*,
  7 F.3d 357 (3d Cir. 1993) ........................................................................................ 3, 6

*In re Donna Karan Int'l Sec. Litig.*,
  No. 97-CV-2011, 1998 WL 637547 (E.D.N.Y. Aug. 14, 1998) .................................. 3

*Glass Dimensions, Inc.* v. *State St. Bank & Trust Co.*,
  285 F.R.D. 169 (D. Mass. 2012) ................................................................................ 15

*Grossman* v. *Novell, Inc.*,
  120 F.3d 1112 (10th Cir. 1997) .................................................................................. 10

*Harris* v. *White*,
  479 F. Supp. 996 (D. Mass. 1979) .............................................................................. 15

*Hoffman* v. *UBS-AG*,
  591 F. Supp. 2d 522 (S.D.N.Y. 2008) ................................................................... 8, 14

*In re Lehman Bros. Sec. & ERISA Litig.*,
  684 F. Supp. 2d 485 (S.D.N.Y. 2010) ........................................................................ 14

*Lilley* v. *Charren*,
  17 F. App'x 603 (9th Cir. 2001) ................................................................................. 12

*In re Merrill Lynch & Co., Inc.*,
    273 F. Supp. 2d 351 (S.D.N.Y. 2003) ...................................................................................3

*Miyahara* v. *Vitacost.com, Inc.*,
    715 F.3d 1257 (11th Cir. 2013) .............................................................................................12

*Omnicare, Inc.* v. *Laborers Dist. Council Const. Indus. Pension Fund*,
    135 S. Ct. 1318 (2015)......................................................................................................8, 13

*In re OPUS360 Corp. Sec. Litig.*,
    No. 01-civ-2938, 2002 WL 31190157 (S.D.N.Y. Oct. 2, 2002) .............................6, 11

*In re Paracelsus Corp. Sec. Litig.*,
    6 F. Supp. 2d 626 (S.D. Tex. 1998)...............................................................................15

*Plumbers Union Local No. 12 Pension Fund* v. *Nomura Asset Acceptance Corp.*,
    632 F.3d 762 (1st Cir. 2011)..................................................................................14, 15

*In re SeaChange Int'l, Inc.*,
    No. CIV.A. 02-12116, 2004 WL 240317 (D. Mass. Feb. 6, 2004) .........................6, 12

*Sheppard* v. *TCW/DW Term Trust 2000*,
    938 F. Supp. 171 (S.D.N.Y. 1996) ..............................................................................3

*Spiegel* v. *Tenfold Corp.*,
    192 F. Supp. 2d 1261 (D. Utah 2002)......................................................................7, 9

*Stadnick* v. *Vivant Solar, Inc.*,
    No. 14-cv-9283, 2015 WL 8492757 (S.D.N.Y. Dec. 10, 2015)............................14, 15

*In re Tellium Inc., Sec. Litig.*,
    No. Civ. A. 02CV5878, 2005 WL 1677467 (D.N.J. June 30, 2005)........................7, 8

*In re Wachovia Equity Sec. Litig.*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011) ......................................................................14

*In re Wells Fargo Mortg.-Backed Certificates Litig.*,
    712 F. Supp. 2d 958 (N.D. Cal. 2010)......................................................................14

## Preliminary Statement[1]

Plaintiffs' task in their response was to refute, with specifics from the complaint, the Underwriters' showing that the Offering Materials disclosed the key terms of the Apple contract and highlighted the very risks that the Complaint says were concealed. Thus, in their opening brief, the Underwriters demonstrated in detail that the Offering Materials informed investors of (i) Apple's rights and GTAT's obligations under the contract, (ii) the parameters of the exclusivity rights Apple enjoyed, (iii) GTAT's limited experience in producing sapphire and the technical challenges it faced, and (iv) the economic features and financial risks of the contract. Rather than respond to these determinative points, Plaintiffs continue to rely on the Complaint's pejorative and legally deficient characterizations of the disclosures. Nor have Plaintiffs refuted the Underwriters' demonstration that GTAT's revenue projections, expressions of optimism, and disclosures concerning its liquidity and capital resources are forward-looking statements protected by the PSLRA safe harbor.

Significantly, too, Plaintiffs have no cogent response to the Underwriters' showing that because Palisade and Highmark were *short sellers* of GTAT common stock rather than purchasers and maintained net short positions throughout the Class Period, they do not have standing to pursue Securities Act claims arising out of the December 2013 secondary offering of common stock. The allegation that they purchased bonds does not confer standing to sue for the purchase of common stock.

---

[1] Defined terms used herein are the same as in the Underwriters' opening brief, filed on October 7, 2015, ECF No. 105-1, and referred to herein as "UW Br." "Pl. Br." refers to pages from Plaintiffs' Omnibus Memorandum of Law in Opposition to the Motions to Dismiss filed on December 18, 2015, ECF No. 116. "Rosen Decl. (10/7/15)" refers to exhibits attached to the Declaration of Richard Rosen in Support of Underwriter Defendants' Motion to Dismiss the Consolidated Amended Complaint, filed on October 7, 2015, ECF No. 105-2. Citations in the form of "Ex." refer to documents attached as exhibits to the Declaration of Richard A. Rosen in Support of this Underwriter Defendants' Reply Memorandum of Law in Further Support of Their Motion to Dismiss the Consolidated Amended Complaint.

I. **THE OFFERING MATERIALS DISCLOSED THE KEY CONTRACT TERMS AND ALL OF THE ATTENDANT RISKS**

   A. **GTAT Fully Disclosed Apple's Rights and GTAT's Obligations Under the Apple Agreement**

Plaintiffs argue that the Offering Materials did not disclose that the Apple agreement was "an onerous and massively one-side deal" that "shifted all economic risk to GTAT." (Pl. Br. 77). Plaintiffs, however, have not identified a single material contract term reflecting the rights of Apple or the obligations of GTAT that was not disclosed or that was misstated. In fact, as discussed in the Underwriters' opening brief, GTAT's SEC filing on November 7, 2013 attached most of the actual text of the Apple contract and the Prospectuses summarized and highlighted all of the key terms of the Apple agreement, including the exact same provisions to which Plaintiffs point when they characterize the deal as "one-sided" and "onerous."

For example, the Offering Materials expressly disclosed that (i) Apple retained the right to direct several aspects of GTAT's performance, including the selection of the tools to be used, (ii) GTAT's sapphire material business would heavily depend on purchases by Apple, (iii) GTAT was subject to minimum and maximum *supply* commitments, but there was no corresponding minimum *purchase* requirement for Apple, (iv) if Apple did not purchase sufficient sapphire, GTAT would be "required to repay . . . significant[] amounts of the prepayment amount using [its] cash resources," which could cause the Company to exhaust all of its cash and force GTAT into default with Apple, entitling Apple to "acquire control and possession of the ASF[2] systems (and to be paid in cash for any deficiency),"[3] (v) Apple had the unilateral right to cancel its prepayment

---

[2]   Advanced sapphire crystallization furnaces ("ASFs") are used to manufacture sapphire.
[3]   *See* Rosen Decl. (10/7/15) Ex. 3, Stock Prospectus at S-2, 4, 7; Ex. 4, Senior Notes Prospectus at S-2, 8, 11.

2

advances, or accelerate repayment thereof, under certain circumstances, and (vi) the agreement provided Apple with certain exclusivity rights. (UW Br. 6-16).

Any investor could readily see that Apple had driven a hard bargain, giving it meaningful advantages over GTAT. Plaintiffs could draw their own conclusions as to whether the deal was "onerous," "massively one-sided," or "shifted all economic risk" to GTAT. Defendants were not required to describe the contract in a pejorative manner. *See In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357, 375 (3d Cir. 1993), *cert. denied sub nom. Gollomp* v. *Trump*, 510 U.S. 1178 (1994) (finding that plaintiffs "cannot successfully contend that the prospectus is actionable because it failed to describe its debt-equity ratio as either 'unwarranted' or 'excessive'").[4]

### B.   GTAT Accurately Disclosed Apple's Exclusivity Rights

Plaintiffs' assertion that GTAT misled investors regarding Apple's exclusivity rights is meritless. GTAT disclosed the precise terms of Apple's exclusivity rights by filing the text of the contract in November 2013, in an SEC filing that was incorporated by reference in the Offering Materials. The Offering Materials fully revealed the wide scope of Apple's exclusivity rights with respect to the consumer electronics industry. (UW Br. 35-37). Plaintiffs do not allege that these disclosures were inaccurate.

The disclosures also informed investors that GTAT was free to sell sapphire materials in the non-consumer electronics sector. Ironically, although Plaintiffs cavil

---

[4]   *See also*, *e.g.*, *In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d 351, 378 n.59 (S.D.N.Y. 2003) ("[T]he securities laws do not require disclosure of any particular adjective when the overall message of caution is communicated to investors."), *aff'd sub nom. Lentell* v. *Merrill Lynch & Co., Inc.*, 396 F.3d 161 (2d Cir. 2005), *cert. denied*, 546 U.S. 935 (2005); *In re Donna Karan Int'l Sec. Litig.*, No. 97-CV-2011, 1998 WL 637547, at *10 (E.D.N.Y. Aug. 14, 1998) ("[T]he securities laws do not require corporate management to 'direct conclusory accusations at itself or to characterize its behavior in a pejorative manner.'" (internal citation omitted)); *Sheppard* v. *TCW/DW Term Trust 2000*, 938 F. Supp. 171, 175 (S.D.N.Y. 1996) ("Defendants were not obligated to describe in pejorative terms the types of mortgage-backed securities in which the Trusts invested.")

3

about certain limited redactions to the publicly-filed copy of the contract, GTAT's disclosures about the exclusivity provisions were confirmed as accurate by the *unredacted* version of the contract on which Plaintiffs now rely. (UW Br. 36-37). The "Permitted Products" section of the contract contains a long list of products, including LED products, point of sale check-out or verification devices, and industrial, aerospace, defense, automotive, medical and financial industry uses to which Apple's exclusivity rights did *not* apply. (UW Br. 36-37). Thus, Plaintiffs' repeated assertion that the agreement prohibited GTAT from conducting sapphire business with anyone other than Apple (*see* Compl. ¶¶153-54; Pl. Br. 81-82) is contradicted by the text of the contract.

Importantly, GTAT warned that its obligations to Apple could have an adverse impact on its practical ability to invest in or operate other portions of its business. (UW Br. 14). Indeed, the Offering Materials disclosed that "[t]hrough the remainder of 2013 and the first quarter of 2014, [GTAT] expect[ed] that [it] will sell a very limited number of ASF units to [its] customers as [it] ramp[ed] up [its] sapphire material operations," and that for this reason, GTAT "expect[ed] to convert very limited amounts in [its] sapphire equipment backlog into revenue during this period."[5] Investors were on notice that GTAT might not be able to take advantage of its other opportunities to sell ASF units because of the significant nature of its contractual commitments to Apple.

Especially in light of these clear warnings, Plaintiffs' continued reliance on Mr. Squiller's statements in late 2014 (Pl. Br. 81-82) is misplaced. Nothing in the Squiller Declaration states that the exclusivity provisions prohibited GTAT from seeking non-consumer electronics business. Rather, Mr. Squiller asserts that, notwithstanding GTAT's contractual *right* to pursue such business, it turned out that GTAT was unable to

---

[5]   Rosen Decl. (10/7/15) Ex. 4 at S-8.

pursue those non-Apple revenue streams as a practical matter due to Apple's conduct *after the Offerings*, including its exercise of what Mr. Squiller characterizes as "*de facto* control" over GTAT's performance. (UW Br. 37-38). The plain thrust of Mr. Squiller's contentions is that GTAT did not anticipate Apple's subsequent behavior at the time the contract was executed and that GTAT's position was that Apple had breached the agreement. Indeed, the parties later asked the Court to approve their settlement of their dispute over contract performance.[6]

### C. GTAT Fully Disclosed the Risks Associated with Producing Sapphire

Although Plaintiffs concede that the Offering Materials disclosed that GTAT had limited operating experience and cautioned about many of the risks associated with this unprecedented design and manufacturing venture, Plaintiffs assert that GTAT also had a specific duty to disclose the precise size—262kg—of sapphire boule that the contract contemplated would be produced, on the theory that this additional information was necessary for investors to appreciate the risk that the contract could not be performed. (Pl. Br. 77).[7] No such disclosure was required.

An omission is only actionable if the disclosure is necessary to ensure that statements made are not "so incomplete as to mislead." *See Backman* v. *Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir. 1990). The First Circuit has emphasized that issuers need not publish every factual detail to avoid liability under the securities laws. *Id.* ("[B]y

---

[6]   *See* Ex. 2, Declaration of Daniel W. Squiller, Dated Oct. 28, 2014, ¶ 3 (filed in support of approval of a settlement agreement with Apple and other parties).
[7]   Plaintiffs rely on alleged statements from a former GTAT Sapphire Product Manager to argue that GTAT knew all along that the Apple contract was "doomed to fail," but senior management was not required to agree with the most pessimistic assessment voiced by anyone involved in the business. (UW Br. 31-32).

revealing one fact about a product, [issuers] [need not] reveal all others that, too, would be interesting, market-wise.").[8]

The Complaint itself alleges that it was understood at the time of the Offerings that (i) no mass-produced smartphone provider had previously been able to develop sapphire crystal that was adequately transparent and sufficiently cost-effective for widespread use as smartphone display screens, (ii) the maximum boule size that any manufacturer had been able to produce was 115 kg, and (iii) boules larger than 165 kg were necessary for widespread use in display screens. (Compl. ¶¶ 47, 49). Against that background, GTAT disclosed that historically, it had been a provider of crystal growth *equipment*—not sapphire material itself—and that it had "limited operating history in the sapphire industry" and "very limited experience operating a material manufacturing operation of this scale." (UW Br. 9-10). GTAT also warned it "may not be able to successfully address [the] challenges" that come along with manufacturing sapphire on such a large scale, disclosing numerous concrete risks and challenges it would face. (*Id.* at 10-11).

Investors were therefore fully informed of the risk that GTAT might not successfully perform the contract. *See In re OPUS360 Corp. Sec. Litig.*, No. 01-civ-2938, 2002 WL 31190157, at *8 (S.D.N.Y. Oct. 2, 2002) (disclosures that the "software was yet to be developed or sold commercially and was subject to multiple future risks sufficiently disclosed the risks that the product would never be commercially

---

[8] *See also In re SeaChange Int'l, Inc.*, No. CIV.A. 02-12116, 2004 WL 240317, at *9 (D. Mass. Feb. 6, 2004) (recognizing that there "can be no liability for [an] omission under the securities laws unless there is a duty to disclose the information" noting that "'[s]ilence, absent a duty to disclose, is not misleading" (citation omitted)); *accord In re Donald Trump*, 7 F.3d at 375 (finding no need to disclose that the casino needed to win an average of $1.3 million daily where investors were aware that "because of its size, the [casino/hotel] would need to generate a particularly high daily casino win").

6

successful").[9]  GTAT, therefore, had no duty to disclose the precise size of the boule contemplated, which was, in any event, a trade secret.

In *Polaroid*, the plaintiffs alleged that Polaroid misled investors by disclosing that Polaroid's new product was selling below cost without also quantifying the below-cost sales and disclosing that the number of sales were below expectations. *Polaroid*, 910 F.2d at 16.  The First Circuit held that Polaroid's disclosures sufficiently informed investors as to the risks involved, foreclosing potential liability based on omissions of particular details.  *Id.*[10]  Similarly, here, the Offering Materials candidly and extensively warned investors of the risks associated with the Apple agreement.

Moreover, the redaction of the precise boule size put investors on notice of the risks in regard to the redacted terms.  *See In re Tellium Inc., Sec. Litig.*, No. Civ. A. 02CV5878, 2005 WL 1677467, at *18-19 (D.N.J. June 30, 2005) ("Investors in Tellium were aware that because of the redactions, they would not be able to evaluate the strength of the contracts based on information including delivery dates, quantities and prices of purchased products, and whether the products covered by the contract were existing products or were yet to be developed.").  Since investors knew that manufacturing sapphire was a new line of business for GTAT and that the largest boule size *any*

---

[9]     *See also Spiegel* v. *Tenfold Corp.*, 192 F. Supp. 2d 1261, 1268 (D. Utah 2002) (finding disclosures that the company had experienced delays in the past and might experience delays again and that the company had not tested the extent to which its products were scalable, sufficient to warn investors about company's potential inability to "complete projects on time, on target, and on budget").

[10]    The Ninth Circuit has similarly found that disclosures comparable to GTAT's were sufficient to warn investors of the risks at issue.  *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507 (9th Cir. 1991), *as amended on denial of reh'g* (Dec. 6, 1991).  First, just as the company in *Convergent* disclosed that it had not manufactured the relevant new products in volume, GTAT disclosed its lack of experience manufacturing sapphire at the scale contemplated under the agreement.  *Id.* at 516.  Second, similar to GTAT's disclosures about the risks involved in manufacturing sapphire, such as power and energy requirements, the court in *Convergent* found sufficient the disclosure of risks involving the "implementation of advanced manufacturing processes."  *Id*.  Third, the court there also found sufficient disclosures that the company was dependent on the timely availability of several advanced components, just as GTAT disclosed that it would be reliant on third party vendors and suppliers.  *Id.*

manufacturer had been able to make was far too small to enable cost-effective production for smartphones, the enormous technological challenge facing GTAT was clear.[11]

### D. GTAT's Disclosures Were Sufficient to Inform Investors of the Limited Time GTAT Had to Produce Sapphire

Plaintiffs also argue that the Offering Materials did not disclose all of the details of the production timeline. (Pl. Br. 79). That argument, too, is unavailing. GTAT had no duty to disclose the precise production timeline because it made no affirmative representations on this subject. Thus, no disclosure could have been rendered misleading by this omission. *See Polaroid*, 910 F.2d at 16 (discussed *supra* at pp. 5-7).

Disclosures in the Offering Materials, however, did make it clear that GTAT would be faced with a tight timeframe,[12] especially because the market was informed that GTAT was starting from scratch. At the time of the Offerings, Plaintiffs knew that the enormous Mesa facility had to be built, and that GTAT still had to (i) design and manufacture ASFs that could produce boules of adequate size and quality, (ii) hire qualified staff, and (iii) develop the rest of the required technology. (UW Br. 3, 6-12).

GTAT also disclosed that by January 1, 2015, it would have to start offsetting— ratably over the course of five years—the $578 million prepayment either by delivering the sapphire material purchased by Apple or by making cash payments to Apple. (UW

---

[11] Plaintiffs' reliance on *Hoffman* v. *UBS-AG*, 591 F. Supp. 2d 522, 532 (S.D.N.Y. 2008) and *Omnicare, Inc.* v. *Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318 (2015) (Pl. Br. 80) is misplaced. In *Hoffman*, the court dismissed plaintiff's claims because the alleged omissions were not material, as they did not "significantly alter[] the 'total mix' of information available" to investors. *Hoffman*, 591 F. Supp. 2d at 532, 535-36 (citation omitted). As for *Omnicare,* it does not support Plaintiffs' theory that disclosure of the exact boule size was required to prevent investors from relying on GTAT's optimistic forward- looking statements about its ability to perform the contract and earn revenue. *Omnicare* addresses the question of when expressions of opinion concerning present facts are actionable. No such statements of opinion are at issue in this case. *Omnicare*, 135 S. Ct. at 1325. Here, Plaintiffs are complaining about forward-looking statements and whether there was adequate risk disclosure—a subject *Omnicare* does not address at all.

[12] Moreover, the fact that the contemplated timeline was redacted from the Apple agreement itself put investors on notice that this was a risk. *Tellium*, 2005 WL 1677467, at *18-19 (discussed *supra* at p. 7).

Br. 13, 17-18). In other words, investors knew that, by January 1, 2015, GTAT would have had to have produced at least $115 million worth of sapphire boules that met Apple's specifications, or else pay that amount to Apple in cash. *See Spiegel*, 192 F. Supp. 2d at 1268 (finding risk disclosures regarding potential difficulties in production were "substantive and tailored to the specific future projection of [company's] ability to complete projects on time, on target, and on budget").

### E. GTAT Fully Disclosed the Risk that the Apple Agreement Might Not Generate Significant Revenue

Plaintiffs' contention that the Offering Materials failed to disclose that GTAT had "no basis to believe that [it] could generate hundreds of millions of dollars from sales to Apple," (Pl. Br. 77), is without merit.[13] First, GTAT never stated that it "could generate hundreds of millions of dollars from sales to Apple," but rather merely projected that it "expects 2014 revenue to be in the range of $600 to $800 million with its sapphire segment comprising up to 80% of the year's total revenue." (Compl. ¶365). While expected revenue from the Apple agreement was certainly included within this projection, so too were the other parts of GTAT's business. For example, as of September 28, 2013, GTAT had an order backlog of $658 million, including $355 million from its sapphire business, from which it was expecting to receive revenue in 2014.[14]

Second, the Offering Materials described the economics of the agreement and warned of the risks that it might not be profitable. Investors were told that GTAT had to use the $578 million Prepayment Amount to design and construct ASFs and purchase

---

[13]   As discussed below, such earnings projections and statements about future performance expectations are forward-looking statements that fall within the safe harbor. *See infra* at § II.

[14]   Ex. 1, 10Q at 33-34. Importantly, the backlog orders for sapphire furnaces were *carved out from Apple's exclusivity rights* in the Apple agreement, meaning GTAT was free to complete, and expect revenue from, those orders during the life of the Apple agreement. (Compl. Ex. B, p.6, §9.2).

9

related equipment for use at the Mesa facility, and that additional funds would be needed for operating the facility, including hiring employees and paying for energy and supplies. (UW Br. 30 n.69). Investors were also told that GTAT would have to repay the entire Prepayment Amount to Apple, either as an offset to amounts due from Apple for the purchase of sapphire material or in cash payments. (UW Br. 6, 13). Thus, GTAT made it clear that it would only earn money on the deal with Apple if (i) GTAT produced at the very least *more than* $578 million worth of sapphire that met Apple's specifications, and (ii) Apple purchased that sapphire, which it was not contractually bound to do. (UW Br. 12-13). Plaintiffs' argument that GTAT concealed that the prepayments amounted to a "revenue wash," (Pl. Br. 12), is incorrect—the Offering Materials said as much. Plaintiffs also ignore the allegations in their own Complaint acknowledging that the proceeds of the December 2013 Offerings—approximately $300 million—were "necessary to commence the installation and operation" of the ASFs required by the Apple agreement, (Compl. ¶355), and that because Apple was not scheduled to make the bulk of the prepayments until 2014, the Company needed the cash generated by the Offerings to begin performing the Apple contract (Compl. ¶358). (UW Br. 30-31).

In addition to disclosing the potential impediments to GTAT's ability to generate revenue from the agreement, the Offering Materials expressly disclosed that GTAT "cannot guarantee that . . . [its] arrangement with Apple will result in actual revenue in the originally anticipated period *or at all*," and that "if Apple does not purchase sufficient quantities of sapphire material [GTAT's] revenues will suffer and [GTAT] may be unable to meet [its] obligations" to repay the repayments. (UW Br. 12-13); *See also Grossman* v. *Novell, Inc.*, 120 F.3d 1112, 1120 (10th Cir. 1997) (finding sufficient disclosures that

10

earnings are "subject to significant volatility" and that revenue "may be unpredictable" and "may fall short of anticipated levels").

### F. GTAT Accurately and Fully Disclosed the Status of Its Liquidity and Cash Reserves

Plaintiffs argue that the Offering Materials falsely asserted that GTAT's existing cash and the Apple prepayments "will be sufficient to satisfy working capital requirements, commitments for capital expenditures, and other cash requirements for at least the next twelve months." (Pl. Br. 82-83).[15] Plaintiffs, however, omit that, in addition to existing cash and the prepayments, GTAT disclosed that it was also relying on "cash [it] received on [its] 3.0% convertible notes and customer deposits," indicating that GTAT was not relying only on cash reserves and the prepayments.[16]

Plaintiffs also disregard cautionary statements in the very same paragraph concerning the Company's liquidity, including the disclosure that GTAT "may be required to increase [its] outstanding indebtedness or raise additional capital . . . which may not be available on favorable terms, or at all." (*Id.*)  Given the numerous disclosures concerning the Company's precarious financial condition, Plaintiffs cannot allege that GTAT misled investors about its liquidity. (UW Br. 26-27).[17]

---

[15] Despite Plaintiffs' allegations that GTAT concealed the true financial condition of the Company (Pl. Br. 82-83), GTAT's financial condition was no secret to Plaintiffs, who knew from GTAT's SEC filings that GTAT's revenues "declined sharply" in 2012 and 2013, and that GTAT was "hemorrhaging cash," and suffering from loss in stock value to the point where "analysts and market observers expressed concern about the Company's poor prospects." (Compl. ¶¶ 7, 43-45; *see also* UW Br. 26-27). Furthermore, the Offering Materials disclosed that GTAT was operating at a net loss, (*e.g.* Ex. 1, 10Q at 2 (disclosing a net loss of $45 million as of September 28, 2013), and warned investors of the many financial risks that could further threaten GTAT's liquidity. (*See* UW Br. 13-14, 26). Notably, despite not receiving the full Prepayment Amount, GTAT remained afloat for nearly twelve months following the Offerings.
[16] Ex. 1, 10Q at 40-41. GTAT's prediction that its cash supply and potential future cash intake would be sufficient are forward-looking statements protected by the safe harbor statute. *See infra* at § II.
[17] In *In re OPUS360 Corp.*, 2002 WL 31190157, at *5, the court found a similar projection regarding cash sufficiency "anticipatory" and not actionable under the Securities Act where accompanied by similar cautionary statements indicating that the company may need to raise additional funds.

11

## II. GTAT'S FORWARD LOOKING STATEMENTS ARE PROTECTED BY THE SAFE HARBOR[18]

The Underwriters demonstrated in their opening brief that GTAT's revenue projections and statements concerning GTAT's liquidity, capital resources, and optimism about the Apple agreement were all forward-looking statements protected by the PSLRA safe harbor. (UW Br. 20-28).[19] In response, Plaintiffs cite to cases that support the unremarkable but irrelevant proposition that the safe harbor does not apply to statements that are not forward looking and that, instead, refer to present facts. (Pl. Br. 84-85). Plaintiffs also fail to rebut the Underwriters' extensive showing that GTAT's forward-looking statements were accompanied by meaningful cautionary language. (UW Br. 20-28). Thus, under First Circuit law, Plaintiffs' claims based on GTAT's forward-looking statements can, and should, be dismissed on this basis alone. (UW Br. 20-21).

Finally, because such statements were forward-looking, even if the Court were to determine that the accompanying cautionary language was not sufficiently meaningful—and it should not—Plaintiffs must still adequately plead that the statements were made with *actual knowledge of falsity*. (UW Br. 20-21). Plaintiffs have, however, "expressly

---

Plaintiffs argue that three paragraphs in the Complaint relevant to their Securities Act claims went "unchallenged." (Pl. Br. 83, n.45 & Appendix A). Paragraph 374 does not apply to the Underwriters because it relates to whether certain Officer Defendants signed certifications, and contrary to Plaintiffs' assertion, the Underwriters did address the two other paragraphs. (*See* UW Br. 17-19 (addressing ¶362); UW Br. 35-38 (addressing ¶368)).

[18] Plaintiffs misleadingly base their Securities Act claims on statements made by Defendant Gutierrez during a November 4, 2013 earnings call that GTAT expected "revenues in 2015 . . . to exceed $1 billion," and "by 2016, driven largely by the incremental strength from [GTAT's] equipment business and continued contribution from [its] sapphire materials business." (Compl. ¶ 365; *see* Pl. Br. 76). The transcript for that earnings call was not incorporated into the Offering Materials, and, therefore, cannot form the basis for liability here.

[19] *See also Lilley* v. *Charren*, 17 F. App'x 603, 607-08 (9th Cir. 2001) (finding that statements from the company that it 'believes' its product will be successful are 'forward-looking in nature'); *In re SeaChange Int'l, Inc.*, 2004 WL 240317, at *5-6 (finding that statements "concerning competitive position, sources of revenue, [and] revenue growth" were forward-looking statements"); *In re Ariad Pharm., Inc.*, 98 F. Supp. 3d 147, 177 (D. Mass. 2015) (finding estimate that global sales "could reach $1,000,000,000 by 2018" was a forward-looking statement); *Miyahara* v. *Vitacost.com, Inc.*, 715 F.3d 1257, 1268 (11th Cir. 2013) (finding that revenue projections and optimistic prospects for the creation of a new distribution facility were forward-looking statements).

disclaim[ed] any allegations of scienter or fraud for these Securities Act claims," thereby pleading themselves out of court. (Compl. ¶¶327, 352; *see* UW Br. 28-29).[20] Plaintiffs cannot have it both ways: they cannot disclaim allegations of fraud to avoid the heightened pleading standard, and yet allege actual knowledge of falsity to avoid the safe harbor statute.[21]

### III. THE NAMED PLAINTIFFS DO NOT HAVE STANDING TO PURSUE SECURITIES ACT CLAIMS BECAUSE THEY WERE *SELLERS* OF GTAT COMMON STOCK

Plaintiffs concede that the Securities Act Plaintiffs—Palisade and Highmark—did not purchase GTAT common stock in the December 2013 Offering. (Pl. Br. 87-90; UW Br. 38-40). In fact, their first transactions in GTAT common stock during the Class Period consisted of massive *short sales* beginning in February 2014. Within two weeks, Palisade had sold short more than 150,000 shares, at a cost of $1.6 million, while Highmark's short position was nearly as large. Although each episodically offset a small portion of its short position with a purchase, each remained net short on GTAT common stock throughout the Class Period.[22]

Palisade and Highmark therefore do not have standing to sue on behalf of investors who *purchased* GTAT common stock in the Offering. Not only was their investment strategy the direct opposite of the investment thesis followed by the common stock purchasers they seek to represent, but Palisade and Highmark each reported *gains* of upwards of $1 million on their common stock transactions.[23] The fact that Palisade and Highmark *profited* from their common stock transactions forecloses their standing

---

[20] *See Omnicare*, 135 S. Ct. at 1327; *see also In re Am Int'l Grp., Inc., 2008 Sec. Litig.*, No. 08-civ-4772, 2013 WL 1787567, at *4-6 (S.D.N.Y. Apr. 26, 2013).
[21] Plaintiffs' reliance on Paragraph 24 of their Complaint is mystifying; it *confirms* Plaintiffs' recognition that actual knowledge of falsity is required to sustain liability for forward-looking statements.
[22] Rosen Decl. (10/7/15) Ex. 7 at 4 & Ex. 8 at 4.
[23] Rosen Decl. (10/7/15) Ex. 9 at 8 & Ex. 10 at 8.

13

here. *See In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 245-46 (S.D.N.Y. 2004) (holding that plaintiffs had no standing where plaintiffs did not suffer losses on their transactions).

Palisade and Highmark say that they are typical of those who bought common stock in the Offering because they bought senior notes. But this is not enough to confer Article III standing to sue on the common stock offering. Notably, the cases on which Plaintiffs rely employ a "typicality" analysis of the sort used in evaluating class certification under Rule 23. But that approach is inconsistent with this Circuit's law.

The law in the First Circuit is clear: plaintiffs must have purchased the security at issue to have standing to sue. This was the holding in *Plumbers Union Local No. 12 Pension Fund* v. *Nomura Asset Acceptance Corp.*, 632 F.3d 762 (1st Cir. 2011)—a case Plaintiffs studiously ignore—which dismissed claims concerning six trusts in which no named plaintiff invested. *Id.* at 770-71 ("'[A] plaintiff who has been subject to injurious conduct of one kind [does not] possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject'" (quoting *Blum* v. *Yaretsky*, 457 U.S. 991, 999 (1982))).[24]

---

[24] *Nomura* relied on a prior, consistent First Circuit decision for its standing analysis. *Barry* v. *St. Paul Fire & Marine Ins. Co.*, 555 F.2d 3, 13 (1st Cir. 1977) (granting summary judgment in favor of defendants where plaintiffs offered no evidence that any named plaintiff had purchased certain insurance policies from defendants). Numerous other courts have similarly held that plaintiffs do not have standing with respect to securities which they did not purchase. *See Stadnick* v. *Vivant Solar, Inc.*, No. 14-cv-9283, 2015 WL 8492757, at *16-18 (S.D.N.Y. Dec. 10, 2015), *appeal docketed*, No. 16-65 (2d Cir. Jan. 6, 2016) (holding that plaintiff lacked standing to maintain Section 12(a)(2) claims on behalf of unnamed class members because he did not purchase his shares in the offering at issue); *In re Lehman Bros. Sec. & ERISA Litig.*, 684 F. Supp. 2d 485, 490-91 (S.D.N.Y. 2010) (dismissing claims based on offerings in which plaintiffs did not purchase even though they "were conducted pursuant to the same shelf registration statements"); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 369 (S.D.N.Y. 2011) ("[E]ven named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." (quoting *Lewis* v. *Casey*, 518 U.S. 343, 357 (1996))); *In re Wells Fargo Mortg.-Backed Certificates Litig.*, 712 F. Supp. 2d 958, 965 (N.D. Cal. 2010) (dismissing claims based on offering in which plaintiffs did not purchase); *Hoffman*, 591 F. Supp. 2d at 532 (finding that plaintiffs "lack[ed]

In *dicta*, *Nomura* suggests that situations *might* exist where the "claims of the named plaintiffs necessarily give them . . . essentially the same incentive to litigate the counterpart claims of the class members." *Nomura*, 632 F.3d at 770. But such a theoretical possibility has no relevance here because Palisade and Highmark—who each held large short positions and made gains on their common stock sales—cannot claim to have relied on the statements in the Offering Materials in making their investment decisions—utterly unlike those who *purchased* common stock and suffered losses on those purchases.[25] Thus, even if it were appropriate to analyze this question with reference to the typicality of the claims of the named plaintiffs, it is hard to imagine a pair of investors who are more *unlike* those who purchased GTAT common stock.

Moreover, in the context of claims under the Securities Act, a long line of cases—unchallenged by Plaintiffs—holds that a plaintiff must be able to *trace* his purchases of securities to the offering at issue to have standing. (UW Br. 38-40 & n.85-86). Obviously, Palisade and Highmark cannot meet the tracing requirement because they were common stock *sellers*, not purchasers. Finally, Plaintiffs' 12(a)(2) claims must be dismissed because they fail to allege that they actually purchased common stock *from* the Underwriters *in* the offering. (UW Br. 40 & n.88).[26]

---

standing for claims relating to funds in which they did not personally invest"); *In re Paracelsus Corp. Sec. Litig.*, 6 F. Supp. 2d 626, 631 (S.D. Tex. 1998) (dismissing claims as to the notes but not as to the stock where plaintiffs only purchased the stock).

[25] Plaintiffs' cite two factually inapposite cases from the District of Massachusetts—*Harris* v. *White*, 479 F. Supp. 996 (D. Mass. 1979) and *Glass Dimensions, Inc.* v. *State St. Bank & Trust Co.*, 285 F.R.D. 169 (D. Mass. 2012). *Harris* involves employment discrimination, not securities, and long predates *Nomura*. *Harris*, 479 F. Supp. at 1000-01. *Glass Dimensions* is based on a shared common injury due to a "breach of fiduciary duty . . . rooted in [the defendants'] conduct in managing" a certain set of funds. *Glass Dimensions*, 285 F.R.D. at 175. Thus, consistent with the *dicta* in *Nomura*, the plaintiff had an "identity of interest" with the other putative class members.

[26] *See also Stadnick*, 2015 WL 8492757, at \*16-18 discussed *supra* at n.24.

## CONCLUSION

For the foregoing reasons, and for the reasons described in the Underwriters' opening memorandum of law, this Court should dismiss Plaintiffs' complaint against the Underwriter Defendants with prejudice.

Dated: March 2, 2016                Respectfully submitted,

| | |
|---|---|
| **BOUTIN & ALTIERI, P.L.L.C.** | **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP** |
| By:  /s/ Edmund J. Boutin<br>Edmund J. Boutin, Esq. (N.H. Bar #59)<br>Brenda Keith, Esq. (N.H. Bar #12883)<br>One Buttrick Road<br>P.O. Box 1107<br>Londonderry, NH 03053<br>Phone:  (603) 432-9566<br>Email:  eboutin@boutinlaw.com<br>Email:  bkeith@boutinlaw.com | By:   /s/ Richard A. Rosen<br>Richard A. Rosen (*pro hac vice*)<br>1285 Avenue of the Americas<br>New York, New York  10019-6064<br>Phone:  (212) 373-3000<br>Email:  rrosen@paulweiss.com<br><br>*Attorneys for Defendants Morgan Stanley & Co. LLC, Goldman Sachs & Co., and Canaccord Genuity Inc.* |

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Underwriter Defendants' Reply Brief in Further Support of Their Motion to Dismiss the Consolidated Amended Complaint was filed through the ECF system and will be served electronically to all registered attorneys in the main case under Civil Action No. 1:14-CV-00443-JL.

Date: March 2, 2016                                   __/s/ Edmund J. Boutin__