## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW HAMPSHIRE

```
-------------------------------------------------------------x
                                          :
In re:                                    :   Chapter 11
                                          :
GT ADVANCED TECHNOLOGIES INC., et al.,:       Case No. 14-11916-HJB
                                          :
        Debtors.¹                         :
                                          :   Jointly Administered
-------------------------------------------------------------x
```

### DECLARATION OF DANIEL W. SQUILLER IN SUPPORT OF DEBTORS' MOTION, PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 361, 363(b), 364, AND 365 AND BANKRUPTCY RULE 9019, FOR ENTRY OF ORDER APPROVING TERMS OF, AND AUTHORIZING DEBTORS TO ENTER INTO, ADEQUATE PROTECTION AND SETTLEMENT AGREEMENT WITH APPLE

I, Daniel W. Squiller, hereby declare under penalty of perjury:

1.      I am the Chief Operating Officer of GT Advanced Technologies Inc. ("GT"), a corporation organized under the laws of the State of Delaware with its headquarters located in Merrimack, New Hampshire.  GT is the direct and indirect parent of the debtors and debtors in possession in the above-captioned cases (collectively, "GTAT" or the "Debtors") and certain non-debtor affiliates which have not sought chapter 11 relief (together with GTAT, the "GTAT Group").  In that capacity, I am particularly familiar with GTAT's business relationship with Apple, Inc. ("Apple") and GTAT's operations at a facility in Mesa, Arizona (the "Mesa Facility") that is owned by an affiliate of Apple.

2.      I have served as Chief Operating Officer since January 14, 2013.  Before joining GT, I served as the chief executive officer at PowerGenix, an innovator in high-power battery

---

¹       The debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are: GT Advanced Technologies Inc. (6749), GTAT Corporation (1760), GT Advanced Equipment Holding LLC (8329), GT Equipment Holdings, Inc. (0040), Lindbergh Acquisition Corp. (5073), GT Sapphire Systems Holding LLC (4417), GT Advanced Cz LLC (9815), GT Sapphire Systems Group LLC (5126), and GT Advanced Technologies Limited (1721).  The Debtors' corporate headquarters are located at 243 Daniel Webster Highway, Merrimack, NH 03054.

technology. At PowerGenix, I led the growth of the company to a successful, global high volume manufacturer with its operations in China. Prior to PowerGenix, I was president of the Power Components Division of Invensys, where I managed that Division's global operations. I earned a Bachelor of Science degree in electrical engineering and a Master's degree from Ohio University.

3.      On October 6, 2014, I submitted a declaration ("Declaration") in support of GTAT's chapter 11 petitions and certain first day motions. I also submitted a supplemental declaration ("Supplemental Declaration") to provide further assistance to the Court and other parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of certain additional relief, in the form of motions and applications, that GTAT has requested of the Court (collectively, the "Additional First Day Pleadings"). I submit this declaration (the "9019 Declaration") in lieu of my Supplemental Declaration and in support of the *Debtors' Motion, Pursuant to Bankruptcy Code Sections 105, 361, 363(b), 364, and 365 and Bankruptcy Rule 9019, for Entry of Order Approving Terms of, and Authorizing Debtors to Enter Into, Adequate Protection and Settlement Agreement With Apple* (the "9019 Motion")*,* which seeks approval of the Adequate Protection and Settlement Agreement, entered into on October 21, 2014, by and among Apple, Platypus Development LLC and the GTAT Parties[2] (the "Settlement Agreement").

4.      Except as otherwise indicated, all facts set forth in this 9019 Declaration are based upon my personal knowledge, my discussions with other members of GTAT's senior management and advisors, my review of relevant documents, including the Settlement Agreement, or my opinion based upon experience, knowledge, and information concerning

---

[2]      GTAT Corporation, GT Advanced Technologies, Inc., GT Advanced Equipment Holding LLC, GT Equipment Holdings, Inc., Lindbergh Acquisition Corp., GT Sapphire Systems Holding LLC, GT Advanced Cz LLC, GT Sapphire Systems Group LLC and GT Advanced Technologies Limited.

GTAT's operations and financial affairs. If called upon to testify, I would testify competently to the facts set forth in this 9019 Declaration. I am authorized to submit this 9019 Declaration on behalf of GTAT.

## SUMMARY OF EVENTS LEADING UP TO CHAPTER 11

5.     The GTAT Group has been a diversified technology company producing advanced materials and equipment for the global consumer electronics, power electronics, solar and light-emitting diode ("LED") industries for many years. Among other things, the GTAT Group has more than 40 years of experience developing technological innovations in connection with the manufacturing of furnaces to grow sapphire for industrial use. After diamonds, sapphire is the second hardest substance on Earth. Sapphire is scratch-resistant and has other properties that make it an ideal material for display applications where those properties provide significant advantages over strengthened glass or other materials used in the consumer electronics field. Sapphire can be fabricated into a variety of shapes and sizes for use in consumer electronics, as well as the military, LED industries, and other industries. In the consumer electronics field, sapphire is currently used in watch crystals, camera lenses, and smartphone displays. GTAT's customers in Asia, which have purchased from GTAT and operate nearly 500 sapphire furnaces installed by GTAT, are significant suppliers to the consumer electronics market, where the sapphire materials they make are used in a variety of applications, including the lens cover, finger print sensor and cover glass for smartphones.

6.     In October 2013, the Debtors and Apple entered into an ambitious transaction for the production of sapphire in quantities, size and quality never before achieved. The essence of the transaction was for GTAT to install in excess of 2000 sapphire-growing furnaces to be operated in a facility provided by Apple. GTAT would operate the furnaces to produce large quantities of high-quality sapphire for use in Apple's products. The transaction had the potential

to be revolutionary for GTAT's business and a significant achievement for Apple.  Becoming a major supplier to Apple would have transformed GTAT's business and dramatically increased its revenue.  Apple would also have benefitted by acquiring a significant amount of high quality sapphire on advantageous economic terms that could be used in its products.

7.      The key to making the transaction profitable for both sides was the production of a sufficient number of 262kg boules of sapphire crystal meeting the specifications required by Apple.  GTAT has sold over 500 sapphire furnaces to Asian customers that produce 115kg boules.  Most sapphire manufacturers using non-GTAT furnaces produce boules of less than 100kg in size.  Production of sapphire at 262kg would provide for scale, that if accomplished, would be profitable to both Apple and GTAT.  Unfortunately, the production of 262kg boules of sapphire could not be accomplished within the time frames the parties had agreed, and was more expensive than anticipated.  These problems and difficulties resulted in a liquidity crisis at GTAT, which led to the commencement of these chapter 11 cases.

8.      As discussed more fully below, this restructuring was necessitated because GTAT's business relationship with Apple has become unsustainable for the reasons described in this 9019 Declaration.  While operating under the October 31, 2013 manufacturing, supply, loan, and related agreements with Apple (collectively, the "Apple Agreements"), GTAT incurred losses—resulting in the current liquidity crisis—that GTAT believes were largely due to actions not within its control.  Because GTAT's facility in Salem Massachusetts (the "Salem Facility") was exclusively dedicated to the sapphire growth project with Apple, GTAT was unable to use that facility for other revenue streams.

9.      GTAT's fabrication costs of the sapphire material grown in the Mesa Facility and Salem Facility furnaces were higher than envisioned, largely because the majority of the

fabrication equipment (in contrast to "growth equipment," *i.e.,* the furnaces) selected for sapphire material could not economically produce a product that Apple would accept. GTAT did not select the fabrication equipment. GTAT was unable to negotiate changes to the pricing regime set forth in the Apple Agreements, and, therefore, GTAT was selling sapphire material at a substantial loss. GTAT's losses would have increased substantially in 2015 when the price for finished sapphire material was scheduled to decrease under the agreements with Apple. To date, GTAT has incurred approximately $900 million in costs in connection with the Apple project (of which $439 million was funded by the Apple prepayment), and, if the pricing set forth in the Apple Agreements could not be renegotiated, GTAT would never realize a profit.

10.     In light of the inability to negotiate changes to the Apple Agreements necessary for GTAT to operate profitably, GTAT reluctantly commenced these chapter 11 cases to preserve the value of its business by separating itself from the business relationship with Apple. Once GTAT has separated itself from the business relationship with Apple, GTAT believes that the completion of its restructuring efforts will allow it to focus its resources on the operation of its core business of selling sapphire furnaces and other products. Reorganized with an appropriate capital structure, GTAT would emerge from chapter 11 in a stronger position and with a sustainable business model that will allow it to compete effectively in the marketplace.

11.     As a result of exclusivity provisions in the Apple Agreements, GTAT has been unable to participate in the global market for its highly valuable sapphire material and equipment. By using the tools available in chapter 11, GTAT believed that it would be able to tap into substantial pent-up demand for sapphire material and equipment in the consumer smartphone and smartwatch markets, segments in which GTAT is currently prohibited from participating.

*Background of Relationship with Apple*

12.     At the outset of negotiations, Apple had offered GTAT what would have been the company's largest sale ever: an order for 2,600 sapphire growing furnaces.  In that scenario, GTAT would operate the furnaces on Apple's behalf, but Apple would own the furnaces. Apple's size and prominence make it the ultimate technology client to land.  The deal with Apple was viewed as a potential game-changer for GTAT.

13.     After months of extensive negotiations over price and related terms, Apple offered a transaction with a different structure:  Apple would no longer buy furnaces from GTAT; instead, GTAT would borrow money from Apple to purchase furnace components and assemble furnaces that would be used to grow sapphire for Apple.  Under the new structure, Apple would act as a lender and would have no obligation to purchase any sapphire furnaces, nor did it have any obligation to purchase any sapphire material produced by GTAT.  At the same time, GTAT would be precluded from doing business with any other manufacturer in or supplier to the consumer electronics market.

14.     Under Apple's new proposal, GTAT was to acquire 2,036 sapphire furnaces using a prepayment from Apple of up to $578 million (however, the last $139 million tranche has not been received by GTAT).  Apple's prepayment was calculated based on the cost to GTAT of the furnaces and related equipment used to produce sapphire material.  GTAT would then manufacture sapphire according to Apple's specifications and repay the Apple loan using either cash or completed sapphire material as the currency for the repayment.

15.     If this business transaction worked as contemplated, GTAT would earn income only if Apple purchased sapphire material in excess of loan repayment obligations.  Due to losses associated with the development of the technology in accordance with Apple's requirements,

6

including new issues associated with manufacturing 262kg boules and changes in product specifications, GTAT ended up bearing the costs of more than 1,300 temporary and permanent personnel, utilities, insurance, repairs, and raw materials with minimal revenue output. The total cost incurred by GTAT pursuant to the project with Apple has so far amounted to approximately **$900 million**.

16. If Apple decided not to purchase sapphire material, GTAT would still be required to repay the full amount of the prepayments in cash. If that eventuality transpired and GTAT did not have the cash needed to repay the loan, Apple could foreclose on the 2,036 furnaces and related equipment. These obligations were secured through a structure that Apple intended to be "bankruptcy remote" and would shield Apple from risk. With the very limited exception for pre-existing orders, GTAT was restricted under the Apple Agreements from selling and marketing its furnaces for consumer electronics applications.

17. In October 2013, GTAT had invested months negotiating a sale contract with Apple while being effectively unable to pursue other opportunities with other customers.

18. Based on the nature of the negotiations, GTAT believes that the key terms of the various agreements presented by Apple were not negotiable. The following terms are illustrative of the terms governing the transaction:

- GTAT committed to supply millions of units of sapphire material. Apple, however, has no obligation to buy any of that sapphire material.

- GTAT was required to form a wholly-owned subsidiary, Debtor GT Advanced Equipment Holding LLC ("GT Equipment"), in October 2013 to implement a structure under which GTAT Corp. would be obligated to buy and assemble furnaces for Apple, but the cash and furnaces would then be "round-tripped" through GT Equipment, referred to in the deal documents as a "bankruptcy remote entity," using a sale and leaseback between GTAT Corp. and GT Equipment.

- Apple was obligated to procure, construct and lease the Mesa facility to GTAT Corp.

7

- The pricing for sapphire was the lesser of (i) the price agreed between the parties, (ii) the "not to exceed" price listed on a schedule, (iii) 95% of the lowest price offered by GTAT to any of its customers or (iv) 99% of the quoted price in a bona fide offer to Apple from another qualified source. There was no pre-established formula to adjust the pricing to account for specification or process changes.

- Apple took a security interest in the entity referred to in the documents as the "bankruptcy remote entity," which was designed to own the furnaces.

- GTAT was prohibited for a number of years from conducting any sapphire business with companies in the consumer electronics space or any direct and indirect supplier to such a company without Apple's express consent.

- If there was excess capacity at the Mesa facility, GTAT Corp., with Apple's consent, was able to use such facility to produce sapphire material for other parties, provided that GTAT Corp. paid Apple an unspecified amount for use of the facility for such business

- If GTAT discloses any aspect of the agreements with Apple, it is liable for breach of confidentiality to Apple for $50 million per occurrence as liquidated damages; Apple is not liable for any liquidated damages if it violates confidentiality.

- GTAT must accept and fulfill any purchase order placed by Apple on the date selected by Apple. If there is any delay, GTAT must either use expedited shipping (at its own cost) or purchase substitute goods (at its own cost). If GTAT's delivery is late, GTAT must pay $320,000 per boule of sapphire (and $77 per millimeter of sapphire material) as liquidated damages to Apple. To put this figure in perspective, a boule has a cost of less than $20,000. Apple, however, has the right, without compensating GTAT, to cancel a purchase order in whole or in part at any time and reschedule a delivery date at any time.

- GTAT must pay $640,000 per boule that it sells to a third party in violation of the exclusivity restrictions in the contract. Apple has no obligation to buy boules exclusively from GTAT.

- GTAT must pay $650,000 per month for any sapphire furnace that is used in violation of GTAT's exclusivity obligations to Apple. To put this figure in perspective, furnaces provided as part of the transactions with Apple were provided at a one-time total cost of approximately $200,000 per furnace. Apple has no exclusivity obligations to GTAT.

- GTAT is prohibited from modifying any equipment, specifications, manufacturing process or materials without Apple's prior consent. Apple can modify any of these terms at any time and GTAT must immediately implement Apple's modifications.

8

- If Apple exercises a Termination Event, and becomes a "lessee" of the furnaces and related equipment in the Mesa Facility, the rental amount Apple would pay to GT Equipment is $50 per month, as compared with the $9.9 million monthly rent payment that GTAT Corp. is deemed to pay to GT Equipment under its lease with GT Equipment.

- Apple has an "exclusive right of negotiation," which basically requires GTAT to negotiate exclusively with Apple for thirty days if it seeks to sell substantially all assets or its sapphire business or it receives an expression of interest from a third party.  If GTAT violates this provision it must pay Apple $1 billion.  Apple has no corresponding obligation to GTAT.

- Apple cannot be liable to GTAT for any design defects or consequential damages from product flaws occurring at the Mesa Facility, which Apple owns, unless GTAT proves that the causes of those defects or flaws were solely Apple's fault.

- The 14 separate agreements reflecting transactions among GTAT Corp. and its subsidiary, GT Equipment, have cross-termination provisions.

- GTAT Corp. was required to maintain certain key personnel.

- The SOW had a term of 7 years, with automatic 1 year extensions unless either party provided notice of termination.

- GTAT sends the sapphire material it produces to Apple's suppliers in Asia. Those suppliers further process the sapphire material into an end product.  If there is a question about whether the sapphire product GTAT ships to Asia is defective, the question is resolved by a committee of three parties, comprised of GTAT, Apple and one of the two vendors in Asia, with each party getting one vote on whether GTAT was at fault or not.

- If Apple terminates the SOW (as defined herein) for cause, then GT Equipment must immediately repay the intercompany loan from GTAT Corp.  By contrast, if GTAT Corp. terminates the SOW for cause, there is no acceleration of the loan obligations.

19. When GTAT's management expressed concerns to Apple regarding the deal terms during the contract negotiations, Apple responded, in substance, that similar terms are required for other Apple suppliers and thus would be required for GTAT as well.  At the same time, however, Apple expressed its commitment to sapphire technology and its intention to work collaboratively with GTAT.  In GTAT's business judgment, based on facts and circumstances

known to GTAT in October 2013, the deal with Apple offered significant opportunities for it, and GTAT elected to proceed.

20.     At the closing of the Apple transaction, GTAT also took on substantial new debt. Specifically, on or about October 30, 2013—the day before the agreements with Apple were signed—GTAT terminated its revolving credit agreement with Bank of America and paid off all outstanding debt owed to Bank of America at that time.  This was necessary to permit Apple to take a lien on all of the assets of both GTAT Corp. and GT Equipment.

21.     As permitted by the Apple agreements, GTAT also borrowed an additional $214 million by issuing additional convertible notes in 2013 and raised $71 million through a concurrent common stock sale.

***Pursuant to the Apple Agreements, Apple Becomes***
***Involved in the Sapphire Growth and Fabrication Processes***

22.     Apple was intimately involved in key aspects of the sapphire growth and fabrication processes.

23.     A specialized facility is required to house over 2,000 sapphire furnaces and the related fabrication equipment.  In addition, due to the nature of sapphire growth, a stable and uninterrupted power infrastructure and supply of process cooling and emergency cooling water is required because interruptions in power or cooling water can render the sapphire-growth material unusable, causing millions of dollars in losses.

24.     Apple selected the Mesa Facility and negotiated all power and construction contracts to design and build out the facility with third parties.  GTAT had no direct communications with the Apple subcontractors that were building out the Mesa Facility.  The first phase of the Mesa Facility was not operational until December 2013—which was only 6 months before GTAT was expected to be operating at full capacity in order to meet its

"Minimum Supply Commitments" (as defined in the SOW).  The parties had originally

anticipated that a facility for the sapphire growth and fabrication project would be ready much

earlier in 2013.

25.     Additional unplanned delays continued to surface, because the Mesa Facility

required a significant amount of reconstruction, including reconstruction of floors roughly the

size of multiple football fields.  The build-out of the Mesa Facility, delays in available power,

and power interruptions, further delayed the ramp-up of sapphire growth and fabrication by

approximately three months.  This was critical lost time for GTAT.

26.     Further complicating GTAT's build-out of sapphire-growth furnace and

fabrication areas, driven by the compressed timetable, there were over 1,200 construction

workers engaged in the build-out of the Mesa Facility—a difficult situation given the need to be

producing at full capacity by summer 2014.

27.     The quality and reliability of the power infrastructure, as noted earlier, is critical

to the sapphire growth process. After much discussion,  it was determined that implementing

power back-up for the furnaces was too expensive and, therefore, non-essential.  That decision

was not made by GTAT.  On at least three occasions, power interruptions occurred, leading to

significant delays and losses of whole production runs of sapphire boules.  GTAT's losses to date

resulting from power outages at the Mesa Facility exceed $10 million.  These power

interruptions also adversely affected GTAT's ability to develop and optimize the process for

growing sapphire material to Apple's specifications because GTAT lost important data every

time a boule was damaged by a furnace run affected by interruptions of power or water.

28.     In addition, Apple sent a significant number of employees to the Mesa Facility

and the Salem Facility, including supply chain, manufacturing, and quality engineers.  These

Apple employees were involved on a full-time basis in GTAT's sapphire growth and fabrication processes. As much as 30% of GTAT's R&D and manufacturing team's time was spent interacting with Apple's employees.

29.    Many of the processes associated with cutting, polishing, and shaping sapphire (this is the "fabrication process", in contrast to the "growth process" that takes place in the furnaces) were new, given the unprecedented volume of sapphire being grown at the Mesa Facility. GTAT did not select what tools to use and what fabrication processes to implement at the Mesa Facility. GTAT had no direct contact with suppliers of cutting and polishing equipment to specify and in some cases develop such tools.

30.    GTAT believes that it was unable to achieve its planned fabrication cost and production targets because many of the tools did not meet their performance and reliability specifications. Over time, a majority of the selected fabrication tools had to be replaced with alternative tools, resulting in additional capital investment and operating costs to GTAT and months of lost time in production. The fabrication cost was approximately 30% higher than planned, requiring nearly 350 additional employees and significantly higher consumption of diamond wire and other wear items than originally planned. GTAT was required to absorb these additional costs.

31.    The final prepayment of $139 million had not been made as of the Petition Date.

32.    When GTAT initially entered into negotiations to sell sapphire furnaces to Apple, it had no sense that, having borrowed hundreds of millions of dollars to pay for the components of more than 2,036 sapphire furnaces, it would end up being unable to meet its cost and production targets for reasons that it believes were beyond its control as well as unforeseen difficulties in scaling its technology to 262kg boules to meet evolving product specifications.

33.     Unfortunately, these chapter 11 cases are not just a dispute between two parties. GTAT has numerous creditors at various levels of its corporate structure.  Notably, GT (GTAT's parent company) is obligor under more than $430 million in convertible notes, a significant portion of which was required to be used to finance GTAT's consummation of the Apple transactions.  In addition, trade creditors hold approximately $145 million in claims against certain GTAT entities.  Finally, GT's public shareholders have seen their investment lose much of its value.

34.     In light of the interests of  GTAT's creditors and other stakeholders, and given the severity of the losses incurred as a result of the transactions with Apple and the terms of the Apple Agreements, GTAT had little choice but to commence these chapter 11 cases.

35.     As recently as a few weeks before the Petition Date, GTAT senior management made a detailed presentation to Apple senior management in charge of the sapphire growth project and advised them that GTAT was losing substantial amounts, that certain specifications needed to be reviewed and that unless pricing was revised and the final prepayment was made in September that it was projected to run out of cash in a few weeks.  While Apple responded with various proposals, after intense negotiations, none of Apple's proposals solved the economic issues in an effective manner, and GTAT believed that acceptance of such proposals would have exposed GTAT to further risk.

**Sapphire Segment**

36.     In 2010, the GTAT Group acquired Crystal Systems Inc., which enabled the GTAT Group to enter the sapphire material and equipment business, with a focus on providing sapphire furnaces for the global LED and certain other industrial markets.  GTAT's sapphire business was traditionally based on designing and selling advanced sapphire crystallization

13

furnaces ("<u>ASF</u>"®), which are used to produce sapphire boules.  These sapphire boules are used, following certain cutting and polishing processes, to make sapphire wafers, a substrate for manufacturing light emitting diodes, as well as sapphire material for a wide range of other industrial and consumer applications including, medical devices, dental, oil and gas, watch crystals, and specialty optical applications such as low absorption optical sapphire for advanced optics and titanium-doped sapphire material for high power lasers.

37.     Sapphire is one of the hardest substances on Earth.  It is scratch-resistant, and can be produced in highly transparent form.  Given its strength and make-up, sapphire is an ideal material to replace the glass screens currently used in today's most popular consumer electronic products, such as smartphones, which are prone to cracking and scratching.  Virtually every consumer has, at some time, experienced the frustration of a scratched or cracked smartphone screen.  The market has been intensely interested in sapphire as a remedy for these common problems.  Sapphire is also believed to use less power than common glass screens, making it an even more ideal replacement for glass screens used in portable consumer electronic products like smartphones.[3]

## Business Relationship with Apple

38.     On October 31, 2013, GTAT entered into the Apple Agreements with Apple.  The Apple Agreements had the effect of shifting the GTAT Group's sapphire business model from being primarily an equipment manufacturer to also being a sapphire materials manufacturer.

39.     Under the Apple Agreements, Apple agreed to advance, subject to certain sapphire material production milestones, approximately $578 million, to GTAT Corporation ("<u>GTAT Corp.</u>") to enable GTAT Corp. to build 2,036 ASF furnaces in the Mesa Facility.  The

---

[3]     For an illustration of how sapphire is manufactured, see
        https://www.youtube.com/watch?v=vsCER0uwiWI

transaction included an exclusivity provision limiting GTAT's sapphire material and equipment sales to segments outside of consumer electronics. GTAT Corp. was also required (a) to form a special purpose subsidiary which was to hold title to the ASF furnaces and related equipment and (b) to pledge its interest in that subsidiary as collateral to secure repayment of the $578 million advance. The most relevant Apple Agreements are summarized below.

40. <u>MDSA and Statement of Work</u>. On October 31, 2013, GTAT Corp. and Apple entered into a Master Development and Supply Agreement and related Statement of Work ("<u>SOW</u>"), pursuant to which the GTAT Group agreed to supply sapphire material to Apple. While the MDSA specifies GTAT's minimum and maximum supply commitments, Apple has no purchase requirements under the terms of the MDSA. Apple was required to make substantial investments in the program.

41. <u>Prepayment Agreement</u>. Also on October 31, 2013, GTAT Corp. entered into a Prepayment Agreement with Apple pursuant to which the GTAT Corp. was eligible to receive $578 million in four separate installments, as a loan to pay for the purchase of sapphire furnaces and other equipment required under the MDSA and related SOW. GTAT Corp. is required to repay this amount ratably over a five year period commencing in 2015 and ending in January 2020, either as a credit against amounts due from Apple purchases of sapphire material under the MDSA or as a direct cash payment. No interest accrues on the loan from Apple under the Prepayment Agreement. The installment payments received by GTAT Corp. were to be used exclusively by GTAT Corp. to fund the purchase of components necessary to manufacture 2,036 ASF furnaces and related processing and manufacturing equipment at the Mesa Facility, which is owned by an affiliate of Apple and leased to GTAT Corp.

42.     The first three installments under the Prepayment Agreement of $225 million, $111 million, and $103 million were received on November 15, 2013, January 23, 2014, and April 4, 2014, respectively.  As of the Petition Date, the fourth and final installment payment, in the amount of $139 million, had not been received by GTAT Corp. on the basis that GTAT had not met certain performance standards.

43.     <u>Formation and Pledge of Special Purpose Entity</u>.  As part of the Prepayment Agreement, GTAT Corp. was also required to form a Delaware limited liability company as a wholly-owned subsidiary, referred to in the deal documents as "bankruptcy remote." Accordingly, GTAT Corp. formed GT Equipment in October 2013.   As collateral for its obligations under the Prepayment Agreement, the MDSA and the SOW, GTAT Corp. entered into a Membership Interest Pledge Agreement, dated October 31, 2013 (the "<u>Pledge Agreement</u>"), under which it pledged its membership interest in GT Equipment to Apple.  GT Equipment is one of the Debtors in these chapter 11 cases.

44.     <u>Intercompany Loan Agreement</u>.  To the extent GTAT Corp. received funds under the Prepayment Agreement, GTAT Corp. was obligated to make an intercompany loan to GT Equipment in the amount of the payment from Apple pursuant to that certain Loan Agreement, dated October 31, 2013 between GTAT Corp. and GT Equipment (the "<u>Intercompany Loan Agreement</u>").  The Intercompany Loan, like the loans under the Prepayment Agreement, has a 0% interest rate.  GT Equipment is required to repay the loan over five years in 58 equal monthly installments of $9,965,517.24.  In addition, GT Equipment's obligations under the Intercompany Loan Agreement are not contractually subordinated to GT Equipment's obligations to Apple.

45.     Although GT Equipment was supposed to use the funds loaned by GTAT Corp. to purchase component parts to construct the 2,036 furnaces at the Mesa Facility, related

16

equipment, supplies or other operational expenditures related to Apple (the "Mesa Equipment"),
GTAT Corp. ordered all furnace parts and paid all third party and related suppliers of the furnace
components.  GTAT Corp. also installed all 2,036 furnaces at the Mesa Facility.

46.     Apple and GTAT Corp. also entered into a Conditional Assignment, dated
October 31, 2013 (the "Conditional Assignment"), under which GTAT Corp. assigned to Apple
all its right, title and interest (but not its obligations) in the Intercompany Loan Agreement.
However, and importantly, this assignment is not effective until the occurrence of (i) a Trigger
Event (as defined below) under the Prepayment Agreement, (ii) GTAT Corp.'s receipt of a
notice of default under the SOW or the MDSA, or (iii) an event of default under the
Intercompany Loan Agreement.  None of these Trigger Events occurred prior to the Petition
Date.

47.     Equipment Lease Agreements.  Because the Apple Agreements contemplate that
GT Equipment would be the owner of the Mesa furnaces, GT Equipment entered into a Lease
Agreement with GTAT Corp., dated October 31, 2013 (the "GT Equipment Lease"), under
which GT Equipment leased the Mesa Equipment to GTAT Corp.[4]  The rent under GT
Equipment Lease is equal to the amount of the Intercompany Loan Repayment that GT
Equipment owed to GTAT Corp. under the Intercompany Loan Agreement.  Consequently,
GTAT Corp. offsets its rental obligations against GT Equipment's obligations under the
Intercompany Loan Agreement and no cash is exchanged.  The practical effect of this aspect of
the agreement is that GT Equipment "repays" the loan to GTAT Corp., at no cost, by offsetting
rent payments under the GT Equipment Lease.

---

[4]     The GTAT Equipment Lease would terminate upon, among other things, a termination of the SOW by
Apple for cause or the occurrence of so-called "Trigger Events" under the Prepayment Agreement which
allow Apple to, among other things, accelerate repayment of amounts advanced to GTAT Corp. under the
Prepayment Agreement.  No Trigger Event occurred prior to the Petition Date.

48.     GT Equipment and Apple also entered into a "contingent" lease agreement, dated October 31, 2013 (the "Contingent Lease Agreement") for the Mesa Equipment. The Contingent Lease Agreement purports to be effective from the date GT Equipment purchases the Mesa Equipment until the earlier of (a) termination of the Contingent Lease Agreement, (b) the Mesa Equipment is no longer property of GT Equipment, (c) expiration or termination of either the MDSA or the SOW. However, Apple is not entitled to take possession of the Mesa Equipment unless and until the GT Equipment Lease is terminated. If Apple took possession of the Mesa Equipment, the rental amount would be $50 per month, as compared with the $9.9 million deemed monthly rent payment that GTAT Corp. pays to GT Equipment. The GT Equipment Lease had not terminated as of the Petition Date.

49.     GT Equipment Secured Guaranty. On October 31, 2013, GT Equipment issued a secured guaranty in favor of Apple guaranteeing all of GTAT Corp.'s obligations under the Prepayment Agreement, the MDSA, or the SOW (the "Secured Guaranty"). GT Equipment granted Apple a first-priority security interest in all of its assets. GT Equipment's obligations under the Secured Guaranty become due when either (i) Apple terminates the SOW for cause or (ii) a Trigger Event occurs under the Prepayment Agreement.

50.     Security Agreement. Apple and GTAT Corp. also entered into a Security Agreement, dated October 31, 2013 (the "Security Agreement") pursuant to which GTAT Corp. granted Apple a security interest and lien on certain of GTAT Corp.'s assets. However, Apple's lien and security interest were extinguished pursuant to the Security Agreement when GT issued the convertible notes described below and contributed proceeds of the note issuance to GT Equipment. Therefore, as of the Petition Date, the only asset of GTAT Corp. which constitutes collateral of Apple is the LLC membership interest in GT Equipment. This means that Apple

18

does not have a so-called "back-up" security interest against the assets of GTAT Corp. in the event the special-purpose-entity structure is disregarded, or if the assets supposedly owned by the special purpose entity are found to be the property of its parent.[5]

51.     Mesa Facility Lease.  GTAT Corp., not GT Equipment, entered into a lease for the Mesa Facility on October 31, 2013.  The landlord at the Mesa Facility is Platypus Development LLC, an affiliate of Apple ("Platypus").  GTAT Corp. pays $100 per year as rent to Platypus for use of the Mesa Facility. Consequently, when furnaces were delivered to, and assembled at, the Mesa Facility, they were delivered to a location where GTAT Corp. was a tenant and were assembled by GTAT Corp.

52.     This 9019 Declaration sets forth GTAT's view of its business relationship with Apple and the events leading up to chapter 11.  As in any highly contentious situation, there is more than one point of view.   GTAT is well aware, and the Court and the parties in interest should expect, that Apple would vigorously dispute any attribution of responsibility to Apple for the failure of the sapphire growth and fabrication project or for GTAT's chapter 11 filing.  Based on my own discussions with Apple executives (or on recent press statements by Apple), I would expect Apple to forcefully contend, among other things, that (a) the failure of the sapphire project was due to GTAT's inability to manufacture sapphire in accordance with the terms of the agreements between the parties, (b) GTAT was free to walk away from the bargaining table at any time in 2013 and yet knowingly entered into the transaction after extensive negotiations because of the enormous growth opportunity that doing business with Apple represented, (c)

---

[5]     This could become relevant because it does not appear that there are any purchase agreements or bills of sales executed between GTAT Corp. and GT Equipment to reflect the "purchase" by GT Equipment from GTAT Corp. of the furnaces.  GTAT Corp., and not GT Equipment, ordered the furnace parts from the third party vendors and paid such third party vendors for all the parts for the furnaces GTAT Corp. installed in the Mesa Facility, and the furnaces were installed in a location where GTAT Corp., not GT Equipment, was the tenant.  In the interest of full disclosure, GT, the ultimate parent of both GTAT Corp. and GT Equipment, reflected the furnaces located at the Mesa facility as assets of GT Equipment (to the extent of $439 million received from Apple) in its public filings.

Apple accepted substantial risks by entering into the transaction, (d) any specifications GTAT

failed to meet were mutually agreed to, (e) Apple did not wrongfully control or interfere with

GTAT's operations, (f) Apple collaborated with GTAT in good faith, and (g) Apple was not

aware of the losses (or the magnitude of the losses) being incurred by GTAT in connection with

the transaction. Given that Apple and GTAT have reached a settlement, it serves no purpose for

me to go through these issues in detail at this stage.

## SUPPORT FOR APPROVAL OF SETTLEMENT WITH APPLE

53.    GTAT and Apple could assert significant claims against each other. Complex

litigation of these claims would be risky, protracted, and expensive and would necessarily entail

comprehensive discovery regarding the operation of the Mesa Facility and the production of

sapphire materials in Mesa, Arizona as well as in China. Rather than litigate with Apple, which

could be harmful to the Debtors' efforts to reorganize, the Debtors entered into the Settlement

Agreement, which, in their business judgment, provides significant benefits to their estates and is

in the best interests of their estates and stakeholders.

54.    I have reviewed the 9019 Motion, and the facts stated therein are true and correct

to the best of my belief with appropriate reliance on corporate officers and advisors.

55.    Resolution of GTAT's relationship with Apple is both beneficial and critical to

the Debtors' ability to successfully reorganize. The Settlement Agreement provides GTAT with

the ability to end its relationship with Apple in an orderly manner that will provide the Debtors

the flexibility to execute their business plan. The Settlement Agreement also avoids the costs,

expenses and uncertainties of litigating with Apple. In my business judgment, and based on

discussions with GTAT's restructuring advisors, the benefits received by the Debtors under the

Settlement Agreement outweigh the consideration provided to Apple and the potential benefits

from uncertain and drawn-out litigation with Apple.

## SUPPORT FOR RELIEF REQUESTED IN ADDITIONAL PLEADINGS

56.     On October 9, 2014, GTAT filed the Debtors' Emergency Motion, Pursuant to Bankruptcy Code Sections 105(a) and 363(b), for Entry of Order (I) Authorizing Debtors to Wind Down Operations at Sapphire Manufacturing Facilities and (II) Approving Wind Down Employee Incentive Plan in Connection with Wind Down of Such Operations (the "Wind Down Motion").  The Wind Down Motion was initially submitted to the Court under seal, but was later filed on the docket [Docket No. 97], pursuant to the Court's Order on Emergency Motion to Seal Under Seal and Authorize Related Hearings to be Conducted in Camera (Doc. 55) Filed by Debtor [Docket No. 86].  On October 17, 2014, GTAT filed a supplement to the Wind Down Motion (the "Supplement") [Docket No. 189], making certain modifications to the proposed employee incentive plan.

57.     I have reviewed the Wind Down Motion and the Supplement, and the facts stated therein are true and correct to the best of my belief with appropriate reliance on corporate officers and advisors.  The facts set forth in the Wind Down Motion and the Supplement, which are the only facts on which the relief requested therein was based, are incorporated by reference in their entirety.

## CONCLUSION

58.     I believe approval of the Settlement Agreement is in the best interests of all stakeholders.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: October 28, 2014

On behalf of GTAT

By:

Name:   Daniel W. Squiller
Title:    Chief Operating Officer